IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ORBITA TELECOM SAC             :

                               :

   v.                     :   Civil Action No. DKC 21-2816

                               :

JUVARE LLC, et al.           :

                               :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract case is the motion to dismiss the First Amended Complaint filed by Defendants Juvare LLC and ESi Acquisition Inc. (ECF No. 33). The issues have been briefed, and the court now rules, no hearing being necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted, although Plaintiff will be provided an opportunity to request transfer rather than dismissal.

## I.  Background

All alleged facts are viewed in the light most favorable to Plaintiff Orbita Telecom SAC ("Orbita"). Orbita is a Peruvian company registered to do business in Maryland. (ECF No. 17, at 1). Its principal place of business is in Maryland. (ECF No. 17, at 2). Orbita's general manager and legal representative is Luis Felipe Paredes. Mr. Paredes lives and works predominantly in Bethesda, Maryland. (ECF No. 17, at 3). Juvare LLC ("Juvare") is

incorporated in Delaware and has its principal place of business in Georgia.  (ECF No. 17, at 3).  ESi Acquisition Inc. ("ESi") is a "commonly controlled, Juvare affiliated company."  (ECF No. 17, at 3).  ESi also seems to be incorporated in Delaware and to have its principal place of business in Georgia.  (ECF No. 17, at 3; ECF No. 34, at 17).  Juvare and ESi share a president and CEO. (ECF No. 17, at 5).  Before being spun-off on their own in May 2018, Juvare and ESi were part of a company called Intermedix. (ECF No. 17, at 7 n.11).

ESi owns an emergency preparedness software tool called "WebEOC."  (ECF No. 17, at 9).  WebEOC is used by federal agencies across the United States.  Multiple agencies headquartered in Maryland use the software.  (ECF No. 17, at 10).  Juvare also provides WebEOC services through ESi to state and local government agencies in Maryland.  (ECF No. 17, at 10).  In fact, an estimated 74% of county governments in the United States use WebEOC.  (ECF No. 17, at 10 n.15).

In April 2017, Orbita contacted Intermedix and obtained a virtual presentation of WebEOC.  (ECF No. 17, at 10).  Shortly thereafter, Orbita and ESi signed a nondisclosure agreement.  (ECF No. 17, at 10).  Orbita then asked Intermedix to develop a presentation on the WebEOC software and a price quotation for a prospective project in Peru with a part of the Peruvian government. (ECF No. 17, at 11).  Intermedix provided both.  Mr. Paredes then

flew to Peru and made the presentation.  Ultimately, however, no agreement was reached with the Peruvian government to license the WebEOC software.  (ECF No. 17, at 11).

In February 2018, Orbita asked Intermedix to give a presentation on WebEOC to another company with which Orbita had previously worked.  (ECF No. 17, at 11).  "ESi/Intermedix" provided the presentation.[1]  A month later, Intermedix's Director of Business Development contacted Orbita to ask about business opportunities in Latin America.  (ECF No. 17, at 11).  Mr. Paredes told Intermedix about a public health project in Peru.  On Intermedix's request, Mr. Paredes travelled to Peru and gave a presentation on WebEOC to Peru's Institute for Civil Defense.  (ECF No. 17, at 11-12).  Between February 2018 and January 2019, Orbita and the now-spun-off Juvare remained in contact about possible business opportunities in Peru and "elsewhere in the Americas." (ECF No. 17, at 12).  During the summer of 2018, Orbita made more presentations to the Peruvian government, "with Juvare's consent and encouragement."  (ECF No. 17, at 12).  It seems that none of these presentations resulted in agreements to license the WebEOC software.

---

[1] Confusingly, Orbita says in the First Amended Complaint that when it refers to Juvare it is referring to both Juvare and ESi. (ECF No. 17, at 8).  Yet, at points throughout the First Amended Complaint, Orbita refers to Juvare and ESi, and at other times just to Juvare.

In early May 2019, Mr. Paredes travelled from Bethesda, Maryland to Juvare's annual conference in New Orleans. (ECF No. 17, at 13). On behalf of Orbita, Mr. Paredes met with senior Juvare leadership. Together they discussed developing a "Program," which would integrate responses across all levels of the Peruvian government to an "anticipated megathrust earthquake and tsunami." (ECF No. 17, at 14). Mr. Paredes subsequently travelled to Peru. While there, he presented the WebEOC software to several ministers in Peru's Institute for Civil Defense. (ECF No. 17, at 14). While in Peru, Mr. Paredes informed Juvare of several other business opportunities. Juvare's presentations and proposals were not ready in time, and Mr. Paredes returned to Maryland empty handed. (ECF No. 17, at 14-15).

Despite these setbacks, conversations continued between Orbita and Juvare. Orbita stressed to Juvare what was needed in proposals to be successful with the Peruvian government. (ECF No. 17, at 15). Juvare stated that it understood, and asked Orbita to prepare a Memorandum of Understanding ("MOU"). (ECF No. 17, at 15).

Orbita provided the MOU in sections to Juvare in August 2019. (ECF No. 17, at 16). The parties held a virtual meeting to discuss the MOU, and Juvare subsequently sent written comments to Orbita on the MOU. (ECF No. 17, at 16). The purpose of the MOU was to "integrate various Peruvian government sector applications,

4

telecom and IT products and services to provide Disaster Risk Management systems and Emergency IP Network services to various government, armed forces and private industry stakeholders." (ECF Nos. 17, at 16; 20-32, at 1).   To accomplish this, the parties planned to create a joint WebEOC-ESINet system.   The WebEOC component would be provided by Juvare and ESi.  (ECF No. 17, at 17).   The ESINet ("Emergency Services IP Network") would be provided by Orbita.  (ECF No. 17, at 17).  Among the provisions of the MOU was a requirement for Juvare to pay Orbita $7,819.00 twice a month.  (ECF Nos. 17, at 18; 20-32, at 6).  The payments were to help fund Orbita's work in Peru cultivating possible business opportunities. (ECF No. 17, at 18).  The MOU was signed on November 13, 2019.  (ECF No. 20-32, at 1).   The MOU states that Orbita offices are in Lima, Peru, and that Juvare's offices are in Atlanta, Georgia.  (ECF No. 20-32, at 1).

Between November 2019 and March 2020, Mr. Paredes and other Orbita agents made contact with various Peruvian government officials. (ECF No. 17, at 21).   Juvare submitted at least one "fatally flawed" proposal during this time.  (ECF No. 17, at 20). The submission of the proposal, however, triggered the accrual of payments from Juvare to Orbita under the MOU.  (ECF No. 17, at 20).   Mr. Paredes and Juvare officers planned to travel to Peru in March 2020 for a presentation to the Peruvian government.  On March 16, 2020, however, Peru declared a national health emergency

due to COVID-19.  Mr. Paredes was already in Peru, but the Juvare officers' trip was cancelled.  (ECF No. 17, at 23).  Orbita and Juvare, however, decided to pursue business opportunities in Peru created by the COVID-19 pandemic.  (ECF No. 17, at 23).  The plan was to pursue smaller projects, which would display the value of the WebEOC software.  Success with those smaller projects would then be parlayed into the bigger project initially envisioned by the parties.  (ECF No. 17, at 24).

Through the spring, summer, and fall of 2020, Orbita sought out opportunities to license the WebEOC software to different Peruvian government entities.  (ECF No. 17, at 25-39).  Orbita had several meetings with the leadership of Peru's second largest public healthcare network.  (ECF No. 17, at 29).  Juvare was supposed to be producing presentations and materials to support Orbita's efforts.  Juvare, however, consistently failed to meet Orbita's expectations as to the quality and timeliness of those materials.  Despite these frustrations, Orbita pressed ahead with efforts to license WebEOC to the healthcare network.  On November 11, 2020, however, Juvare informed Orbita that it was "discontinue[ing] actions in Peru."  (ECF No. 17, at 39).  This seemingly halted the collaboration between the parties.

A year later, Orbita sued Juvare, Robert Watson, CEO and President of Juvare and ESi, and Kaleb Brown, Direct of Business Development at Juvare.  (ECF No. 1).  Orbita subsequently filed

its First Amended Complaint, (ECF No. 17), in which it removed Robert Watson and Kaleb Brown as defendants, and added ESi as a defendant.  (ECF No. 17, at 1).  Orbita asserts a variety of claims, including breach of contract; breach of the duty of good faith and fair dealing; wrongful termination of contract; fraud, deceit, and misrepresentation; fraud in the inducement; and reputational damages.   (ECF No. 17, at 47-58).   Orbita's allegations include that Juvare failed to pay $154,816 of the semi-monthly payments agreed to in the MOU, that Orbita lost out on business opportunities because of Juvare, and that Orbita's business reputation was damaged by Juvare.  Defendants Juvare and ESi moved to dismiss the First Amended Complaint.  (ECF No. 33). Defendants argue, among other things, that Orbita has not sufficiently alleged that this court has personal jurisdiction over them.[2]

---

[2] Defendants also assert that venue is improper.  This issue does not need to be resolved because Orbita has not alleged a *prima facie* case for personal jurisdiction under Maryland's long-arm statute.  If the question of venue had been reached, however, venue may have been found appropriate because at least some of the work done by Orbita under the MOU was completed in Maryland.  Orbita claims Defendants owe it payment for work completed under the MOU. Venue is appropriate in the forum where work for which payment is sought was completed. *Mitrano v. Hawes*, 377 F.3d 402, 405-06 (4th Cir. 2004) (finding plaintiff's work under contract was a substantial part of events and omissions giving rise to claim for breach of contract where plaintiff's work created entitlement to sought payment).

## II.  Standard of Review

When a court's power to exercise personal jurisdiction is challenged under Fed.R.Civ.P. 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted).  If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits, and discovery materials, "the plaintiff need only make a *prima facie* showing of personal jurisdiction." *Id.*  All jurisdictional allegations must be construed "in the light most favorable to the plaintiff," and "the most favorable inferences" must be drawn for the existence of jurisdiction. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).

## III. Analysis

Where a defendant is a nonresident, a federal district court may exercise personal jurisdiction only if "(1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016) (quotation omitted).

The Maryland long-arm statute authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment. *Perdue Foods*, 814 F.3d at 188 (citing *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 22 (2005)). This broad reach does not suggest that analysis under the long-arm statute is irrelevant; rather, it reflects that, "to the extent that a defendant's activities are covered by the statutory language, the reach of the statute extends to outermost boundaries of the due process clause." *Dring v. Sullivan*, 423 F.Supp.2d 540, 545 (D.Md. 2006) (quotations omitted). Both the Maryland Court of Appeals and the Fourth Circuit have held that it is not "permissible to simply dispense with analysis under the long-arm statute." *Pandit v. Pandit*, 80 F.App'x 179, 185 (4th Cir. 2020) (unpublished) (quoting *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6 (2006)). To satisfy the long-arm statute, a plaintiff must specifically identify a statutory provision that authorizes jurisdiction, either in his complaint or in his opposition to a Fed.R.Civ.P. 12(b)(2) motion. *See Johansson Corp. v. Bowness Constr. Co.*, 304 F.Supp.2d 701, 704 n.1 (D.Md. 2004); *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F.Supp.2d 649, 653 (D.Md. 2001).

Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103, provides:

(b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State;

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

There is a limiting condition in § 6-103(a): "If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section."

Orbita did not identify a specific provision of the long-arm statute under which there is jurisdiction.  In fact, Orbita merely

10

cites to § 6-103 and contends that general personal jurisdiction exists over both defendants.   (ECF No. 34-1, at 6).   The First Amended Complaint alleges, however, that Defendants did business with entities in Maryland, including federal and state government agencies.   (ECF No. 17, at 10).   Orbita also alleges that between April 2017 and December 2020, its officer, Mr. Paredes, spent 75% of his time in Bethesda, and that Defendants communicated with Mr. Paredes when he was in Maryland.   (ECF No. 17, at 2).   Defendant Juvare also made $48,478 of the payments to Orbita under the MOU, although it is not clear to where the payments were sent.   (ECF No. 17, at 47).   Based on these allegations, Defendants identify three possible subsections under which Orbita may have attempted to allege personal jurisdiction: (b)(1), (b)(3), and (b)(4).   (ECF No. 33-1, at 14).

**Subsection (b)(1)**

Transacting business pursuant to subsection (b)(1) "requires 'actions [that] culminate in purposeful activity within the State.'" *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md.App. 559, 568 (1993); *Prince v. Illien Adoptions Int'l, Ltd.,* 806 F.Supp. 1225, 1228 (D.Md.1992); *Sleph v. Blake*, 76 Md.App. 418, 427, 545 A.2d 111 (1988), *cert. denied,* 314 Md. 193, 550 A.2d 381 (1988).   Where the contacts involve a contract, "Maryland courts could and would assert jurisdiction over a party to a contract in a suit for breach of that contract if the party has performed 'purposeful acts' in

11

Maryland 'in relation to the contract, albeit preliminary or subsequent to its execution.'" *Du-Al Corp. v. Rudolph Beaver, Inc.,* 540 F.2d 1230, 1232 (4th Cir. 1976) (citing *Novack v. Nat'l Hot Rod Ass'n,* 247 Md. 350, 357, 231 A.2d 22 (1967)). Subsection (b)(1) does not require the defendant to have been physically present in Maryland. *See Bahn,* 98 Md.App. at 568, 634 A.2d 63 (finding that under this subsection "[t]he defendant need never have been physically present in the state"); *Sleph,* 76 Md.App. at 427 (holding that a "nonresident who has never entered the State ... may be deemed to have 'transacted business' in the State within the meaning of subsection (b)(1) as long as his or her actions culminate in 'purposeful activity' within the State."). An essential factor in determining whether business transactions give rise to specific jurisdiction is whether the defendant initiated the contact. *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 766 (D. Md. 2009). Finally, even a single contact with the forum can satisfy the transaction of business standard in subsection (b)(1). *Jason Pharm., Inc. v. Jianas Bros. Packaging Co.,* 94 Md.App. 425, 432 (1993).

Orbita makes a variety of allegations about Defendants' business in Maryland.[3] The allegations which give rise to its

---

[3] Orbita argues that the corporate veil should be pierced and that ESi's contacts should be imputed to Juvare because they are *alter egos*. (ECF No. 34-1, at 21). As will be explained, even when Defendants' contacts are considered together, Orbita has not

claims, however, are that Defendants entered a contract with Orbita to do work in Peru, communicated with Orbita about that work, did unsatisfactory work, and made incomplete payments to Orbita under that contract.[4]  That does not constitute transacting business in the State of Maryland.  *Weist v. City Capital Corp.*, No. 10-cv-1557-DKC, 2010 WL 4455920, at *3 (D.Md. Nov. 8, 2010) ("Here, it is doubtful that Mutual Property's entering into contracts with a Maryland resident for the management of properties located in Michigan could constitute transacting business in the State of Maryland.") (citing *Joseph M. Coleman & Assoc., Ltd. V. Colonial Metals,* 887 F.Supp. 116, 118-19 n.2 (D.Md. 1995)).

It is true that courts have found that defendants transacted business when there is a contract and correspondence between the parties.  *See Jason*, 94 Md.App. at 433-34 (finding business transacted where defendant contacted Maryland-based plaintiff, engaged in several weeks of negotiations over price of purchasing machinery from plaintiff, entered a contract, and sent down payment into Maryland); *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md.App. 559, 570 (1993) (finding insurance company transacted business in Maryland by sending notices to plaintiffs in Maryland, contracting

---

alleged a *prima facie* case for the assertion of personal jurisdiction.

[4] While Orbita does allege that Defendants did business with other entities in Maryland, those allegations are immaterial to this analysis because of the limiting condition in § 6-103(a).

with them in Maryland, and receiving payments sent by plaintiffs
from Maryland). Here, however, the conduct Orbita points to does
not qualify as "transacting business" within Maryland. Defendants
sent communications to an Orbita agent concerning efforts to
license *Defendants'* software in *Peru*.[5]  That is different from
purchasing equipment in Maryland or selling insurance to customers
in Maryland. *Cf. Advanced Datacomm Testing Corp., v. PDIO, Inc.*,
No. 2008-cv-3294-DKC, 2009 WL 2477559, at *5 (D.Md. Aug. 11, 2009)
(not finding business transacted and distinguishing *Jason* and *Bahn*
where parties sent and received invoices and payments between
Virginia and Maryland, and defendant occasionally sent employees
to Maryland at plaintiff's request, but contract was signed in
Virginia and contract was to be performed in Virginia); *Coroneos
v. Labowitz*, No. 19-cv-3579-DKC, 2020 WL 2097628, at *4 (D.Md. May
1, 2020) (finding trustee did not transact business in Maryland
where Virginia-based trustee did not initiate contact with
previous Maryland-based trustee, was to administer trust from
Virginia, trust was not originally under the supervision of any
court, and trustee's duties primarily involved sending

---

[5] Defendants also made some payments to Orbita, but it is not
clear whether they sent payments to Mr. Paredes in Maryland, or to
Orbita's office in Peru, which is the only listed address for
Orbita in the MOU. Even if Defendants sent payments to Mr. Paredes
in Maryland, as with the communications between the parties, these
payments were part of a transaction to do business in Peru, not
Maryland.

14

disbursements to family members, none of whom resided in Maryland). Moreover, it was Orbita that initiated contact with Defendants in 2017, and again in 2019 when Mr. Paredes travelled to New Orleans and discussed possible business opportunities for Juvare in Peru. The 2019 meeting set-in motion the events culminating in the signing of the MOU. Orbita has not alleged a *prima facie* case of transacting business.

### Subsection 6-103(b)(3)

To satisfy § 6-103(b)(3), both the injury itself and the act giving rise to the injury must have occurred and originated in Maryland. *Zinz v. Evans & Mitchell Indus.*, 22 Md.App. 126 (1974). Orbita says that "tortious acts" happened when it received communications from Defendants. (ECF No. 34-1, at 11). There is no allegation, however, that Defendants ever sent communications or took actions while in Maryland that resulted in tortious injury to Orbita. Rather, all of Orbita's allegations against Defendants concern actions they took (or did not take) outside of Maryland. Orbita has not alleged that Defendants' conduct falls under the scope of § 6-103(b)(3).

### Subsection 6-103(b)(4)

Subsection (b)(4) has been construed as a general jurisdiction statute. *See Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F.Supp.2d 903, 912 n.11 (D.Md. 2008) (citing *Zawatsky v. John Alden Life Ins. Co.*, 822 F.Supp. 1215, 1216 n.3 (D.Md. 1993);

*Bass v. Energy Transp. Corp.*, 787 F.Supp. 530, 534-35 (D.Md. 1992)). Courts have general jurisdiction over defendant corporations when "their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945). The "paradigm forums where corporations are fairly regarded as at home are the forums where it is incorporated and where it has its principal place of business." *Fidrych v. Marriott International, Inc.*, 952 F.3d 124, 132 (2020). Only in the "exceptional case" will "a corporation's operations in a forum other than its formal place of incorporation or principal place of business . . . be so substantial and of such a nature as to render the corporation at home in that State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014).

Defendants do not meet the paradigm. Juvare is incorporated in Delaware and has its principal place of business in Georgia. ESi is incorporated in Delaware, and seems also to have its principal place of business in Georgia. Instead, Orbita seems to be alleging that Defendants' affiliation with Maryland is so continuous and systematic that Defendants are at home. (ECF No. 34-1, at 21).

Orbita alleges that ESi is registered to do business in Maryland and that Juvare and ESi did business with "many federal

agencies in the United States including those headquartered in Maryland," as well as Maryland State and local government entities. (ECF No. 17, at 10).  That is not enough.  A corporation must have more than systematic and continuous contacts for a court to exercise general jurisdiction.  *Marriott*, 952 F.3d at 134.  Moreover, the fact that ESi is registered to do business in Maryland "is of no special weight[.]"  *Ratliff v. Cooper Labs, Inc.*, 444 F.2d 745, 748 (4th Cir. 1971).  The real question is whether the corporation's contacts with the forum are substantial enough for the corporation to be at home.  *Marriott*, 952 F.3d at 134.  While Orbita argues that Defendants do "massive" business in Maryland, it also alleges that Defendants license WebEOC across the United States, with an estimated 74% of county governments using the software in addition to various federal agencies.  (ECF No. 17, at 10, 10 n.15).  Thus, Orbita has not alleged that Defendants' business in Maryland, either individually or together, differs from their business in other states, such that they are at home in Maryland.  *Cf. Fidrych*, 952 F.3d at 134 (rejecting general jurisdiction where Plaintiffs did not make allegations distinguishing defendant's relationship with the forum state from any other state where it did business and was not incorporated or had its principal place of business).

**Subsections (b)(2); (5); and (6)**

Although not raised by either party, the second, fifth, and sixth subsections of the long-arm statute are likewise unavailing. There is no allegation that Orbita's claims arise from Defendants contracting to supply goods, food, services, or manufactured products in the State of Maryland.  Nor is there an allegation that Defendants have an interest in, use, or possess real property in the State of Maryland.  Lastly, there is no allegation that Defendants contracted to insure or act as surety for any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State of Maryland.  There is no *prime facie* showing that Defendants are subject to jurisdiction under any of these three subsections of the long arm statute.

Orbita fails to make a *prima facie* showing that this court has personal jurisdiction over Defendants according to Maryland's long-arm statute.[6]  It is therefore unnecessary to decide whether

---

[6] Orbita raises four issues for which it would like limited discovery if the issue is dispositive: (1) for the purpose of venue whether Defendants conduct business in Maryland (ECF No. 34-1, at 8); (2) whether Juvare did business in Maryland through ESi (ECF No. 34-1, at 9 n.2); (3) the extent to which Juvare and ESi "actively solicit business in Maryland" (ECF No. 34-1, at 10); (4) as far as piercing the corporate veil for the purposes of general jurisdiction, whether Juvare exerted considerable control over the activities of ESi (ECF No. 34-1, at 21).  None of these four issues is dispositive and thus Orbita will not be granted limited discovery.

exercising personal jurisdiction would comport with the Due Process clause.    Nor will Defendants' remaining arguments be addressed here.

## IV.  Conclusion

Lack of personal jurisdiction is an impediment to a decision on the merits here.   The question then is whether to dismiss, or if it is in the interest of justice, to transfer the action to another district where the impediment does not exist.  *Porter v. Groat*, 840 F.2d 255, 258 (4th Cir. 1988); 28 U.S.C. § 1406.  Orbita has not requested that the case be transferred to a different jurisdiction or suggested which one would be appropriate.  In fact, Orbita asserts that Georgia and Delaware, likely candidates for transfer, are inconvenient and prejudicial forums.  (ECF No. 34-1, at 17).   Orbita, however, will be given fourteen days to file a request to transfer, identifying what it contends is an appropriate transferee district and addressing the factors under § 1406.  If such a request is filed, Defendants will be given an opportunity to respond.   If no such request is filed, then Plaintiffs' First Amended Complaint will be dismissed without prejudice.

<br>

                /s/
                DEBORAH K. CHASANOW
                United States District Judge